JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL OSHESKE, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SILVER CINEMAS ACQUISITION CO., d/b/a LANDMARK THEATERS,<br><br>Defendant. | Case No. 2:22-cv-09463-HDV-JCx<br><br>**ORDER GRANTING DEFENDANT SILVER CINEMAS ACQUISITION CO.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT [17]** |

I.  INTRODUCTION

This case presents a novel issue: whether movie theaters are subject to the requirements of the Video Privacy Protection Act of 1988 ("VPPA"). Congress enacted the VPPA to protect privacy over a person's video viewing habits. The law prohibits certain individuals and entities from disclosing information about a person's video viewing history. These entities, defined as "video tape service providers," range from the local video rental store to modern streaming services and include anyone in the business of rental, sale, or delivery of audio visual materials broadly defined.

Plaintiff brings a claim against Defendant Silver Cinemas Acquisition Co. d/b/a Landmark Theaters ("Landmark") for violating the VPPA by disclosing to Facebook the title of a movie for which Plaintiff purchased a ticket on Landmark's website. This disclosure violates the VPPA only if Landmark is a "video tape service provider" under the statute's definition. Plaintiff argues Landmark qualifies because it is in the business of selling movie tickets and delivering video content in theaters.

The Court disagrees. The statutory text itself forecloses Plaintiff's theory. Movie theaters sell *tickets*—essentially licenses to enter and view a movie in a public theater at a certain place and time—they do not rent or sell audio visual materials themselves. Nor do movie theaters "deliver" audio visual material in the ordinary sense of the word. Moreover, the legislative history and context of the VPPA makes clear that the statute covers only entities that rent, sell, or deliver audio visual materials designed to be viewed *in the privacy of one's home*. To expand the VPPA to cover the *public* act of attending a movie theater is a bridge too far and is patently inconsistent with both the plain language and legislative history of the VPPA itself.

Defendant's Motion to Dismiss is granted.

II. BACKGROUND

Plaintiff brings a putative class action complaint against Defendant Landmark alleging that Landmark violated the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*. through Landmark's alleged sharing of consumers' personally identifiable information ("PII") and video watch information with third party, Facebook, without Plaintiff's informed written consent. Compl. ¶¶ 1, 6. Plaintiff defines the class as "all Facebook users in the United States who purchased movie

2

tickets on the Landmark website where, within the statute of limitations, Landmark disclosed to Facebook the name of the movie the user purchased tickets for (the "Class")." Compl. ¶ 54.

Landmark owns and operates a website, www.landmarktheaters.com, where consumers can watch trailers, browse showtimes, and purchase movie tickets. Compl. ¶ 3. Plaintiff alleges that, when a Facebook user is logged into Facebook and purchases a movie ticket on the Landmark website, Landmark discloses to Facebook the name of the movie title and the Facebook User ID. Compl. ¶ 6. By selling tickets to prerecorded movies, which have traditionally been shown via open-reel technology, and delivering those movies to consumers in movie theaters, Plaintiff alleges Landmark is a "video tape service provider" ("VTSP") under the VPPA. Compl. ¶ 17.

When a user logs into Facebook using an internet browser, a "cookie"—a piece of code placed on a browser by a server that receives and stores information—is placed on the user's browser. Compl. ¶¶ 23-24. The cookie allows Facebook to identify users when they visit Facebook.com and allows Facebook to track the user's activity across the web on the same browser. Because the Facebook ID is specific to a person, unlike an IP address for example, Facebook can match up a user's activity across devices (*e.g.*, cell phone, laptop, tablet) using different browsers. Compl. ¶¶ 25-27. Businesses hosting websites can install "pixels" on their sites, also known as "web beacons." When a user visits a web page containing the Facebook pixel, the pixel is programmed to contact the Facebook ad server. Compl. ¶¶ 28-29. Because Facebook can identify the Facebook users visiting their websites, the pixels enable businesses to target advertisements to specific users. Compl. ¶ 32.

Plaintiff has had a Facebook account since 2015. Compl. ¶ 45. When Plaintiff accessed the Landmark website and purchased a movie ticket on February 27, 2021, Landmark shared the name of the movie with Facebook, along with his Facebook ID. Compl. ¶ 48.

The VPPA provides:

(a) **Definitions.** --For purposes of this section--

…

(4) the term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery

3

    of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure.  18 U.S.C. § 2710(a)(4).

 (b) **Video tape rental and sale records.**--(1) A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d).  18 U.S.C. § 2710(b)(1).

### III. LEGAL STANDARD

  Landmark brings this Motion pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  Rule 12(b)(6) allows a party to seek to dismiss a complaint for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

  Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n. 2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555; *see also Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

  Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 697 (quoting *Twombly,* 550 U.S. at 570).  Only where a plaintiff fails to "nudge[ ] [his or her] claims ... across the line from conceivable to plausible[,]" is the complaint properly dismissed. *Iqbal,* 556 U.S. at 680.  While the

plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV. DISCUSSION

Congress passed the VPPA[1] as "a context-specific extension of the substantive right to privacy." *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (The VPPA "protects generally a consumer's substantive privacy interest in his or her video-viewing history."). "The VPPA was enacted in 1988 in response to the Washington City Paper's publication of then-Supreme Court nominee Robert Bork's video rental history. The paper had obtained (without Judge Bork's knowledge or consent) a list of the 146 films that the Bork family had rented from a Washington, D.C.-area video store." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citing S. Rep. 100–599, at 5 (1988)). With the VPPA, Congress intended "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id*.

The statute prohibits certain actors—"video tape service providers" as defined in 18 U.S.C. § 2710(a)(4)—from knowingly disclosing information about a person's video watching history. The facts of this case present a seemingly simple question: whether movie theaters are video tape service providers ("VTSPs"). A VTSP is defined as "any person, engaged in the business … of **rental, sale, or delivery** of prerecorded video cassette tapes or **similar audio visual materials** …." 18 U.S.C. § 2710(a)(4) (emphasis added). Put differently, the Court must determine whether movie theaters like Landmark are in the business of renting, selling, or delivering "similar audio visual materials."

"Statutory construction must begin with the language employed by Congress and the

---

[1] "[I]n order to plead a plausible claim under section 2710(b)(1), a plaintiff must allege that (1) a defendant is a [VTSP], (2) the defendant disclosed '[PII] concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). In its Motion, Defendant asserts that Plaintiff has failed to adequately plead elements (1), (2), and (3). Defendant also argues the VPPA is unconstitutional (i) facially because of overbreadth and vagueness; (ii) facially in violation of the First Amendment; and (iii) as applied to Defendant. For the reasons described below, the Court need only reach element (1)—whether Defendant is a VTSP.

5

assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Paulson*, 68 F.4th 528, 536 (9th Cir. 2023) (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)). When interpreting a statute, courts must give words their "ordinary or natural meaning." *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 67 F.4th 1027, 1036 (9th Cir. 2023) (quoting *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. ——, 141 S. Ct. 2172, 2176 (2021)). For terms that are not defined by the statute itself, courts "consult common dictionary definitions to divine the ordinary, contemporary, common meaning at the time the statute was enacted." *Dep't of Hum. Servs., Div. of Vocational Rehab., Hoopono-Servs. for the Blind v. U.S. Dep't of Educ., Rehab. Servs. Admin.*, 46 F.4th 1148, 1155 (9th Cir. 2022) (internal citation omitted).

Whether the definition of "video tape service provider" encompasses movie theaters like Landmark can and should be determined by a careful textual analysis of the words "rental, sale, or delivery" in the statutory definition. When used in this context, each of these acts—renting, selling, and delivering—describe a *transfer* of some possessory interest in the audio visual materials.[2] None describe the business of Landmark. Movie theaters do not rent movies, sell movies, or deliver movies; they "show" movies.

Plaintiff contends that Landmark falls within the VTSP definition because its primary business is "selling tickets" to movies and "delivering that video content to consumers in theaters." *See* Plf.'s Opp., [Dkt. No. 25] at 5. But that argument conflates the relevant terms. Of course, movie theaters do *sell*; but, they do not sell (or even rent) *audio visual materials*. When consumers purchase a movie ticket, they are purchasing a license to enter the theater premises at a particular time and, in effect, attend a **public event**. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65, 93 S. Ct. 2628, 2639 (1973) (defining motion-picture houses and theaters as quintessential places of public

---

[2] To "rent" is "to grant the possession and enjoyment of for rent." Webster's Third New International Dictionary 1923 (1986) (def. 3). To "sell" is "to give up (property) to another for money or other valuable consideration: hand over or transfer title to (as goods or real estate) for a price." *Id*. at 2061 (def. 2a(1)). To "deliver" is to "give, transfer: yield possession or control of; make or hand over." *Id*. at 597 (def. 2).

accommodation and declining to find individuals retain a right of privacy over private acts conducted in public places).

Similarly, to say a movie theater "delivers" movies is to stretch the natural meaning of the verb beyond recognition. *United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir. 2006) ("When interpreting a statute, we must give words their 'ordinary or natural' meaning.") (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 8–9, 125 S.Ct. 377 (2004)). Even Plaintiff's chosen dictionary definition of "deliver" ("to send, provide, or make accessible to someone electronically") connotes a transfer of a possessory interest[3] that is lacking here. Plf.'s Opp. at 5.

Moreover, to the extent the statutory language is considered ambiguous, legislative history reinforces the Court's interpretation. In passing the VPPA, Congress was concerned with protecting privacy around what people chose to watch *in the privacy of their own homes*. For example, when denouncing the disclosure that prompted the legislation, Senator Leahy, the bill's sponsor said, "It is nobody's business what [people] watch on television or read or think about **when they are home**." S. Rep. 100-599, at 5-6 (emphasis added); *see also* 134 Cong. Rec. S16312-01, 1988 WL 177971 ("Who would guess that the choice of movies one watches **in the privacy of the home** would not be confidential? The Video Privacy Protection Act takes an important step in ensuring that individuals will maintain control over their personal information when renting or purchasing a movie.") (Sen. Simon) (emphasis added); *id.* ("It is simply no one's business what … anyone else chooses to watch **in their home**.") (Sen. Leahy) (emphasis added). There is nothing in the legislative record to indicate or even suggest that the VPPA was intended to cover public acts.[4]

---

[3] Plaintiff argues this distinction adds a requirement that the content be tangible—a proposition rejected by other Courts. *See, e.g.*, *In re Hulu Priv. Litig.*, 2012 WL 3282960 at *4 (rejecting Hulu's argument that the audio visual materials must be "composed of physical matter"). Not so. The Court agrees that the materials need not be delivered in a particular format. But even with delivery through streaming, the consumer is given a possessory interest that allows them to view the videos in their homes or at the place of their choosing.

[4] Courts have explained that the VPPA was predicated on existing constitutional and substantive protections of the right to privacy. *See Eichenberger*, 876 F.3d at 983 ("[T]he VPPA provision at

Plaintiff argues the VPPA was drafted broadly to protect consumer privacy as technology evolves. *Eichenberger*, 876 F.3d at 986 ("Modern technology may indeed alter—or may already have altered—what qualifies under the statute."). And so it has. For example, courts have expanded the VPPA to cover businesses that allow consumers to stream video content directly into their home. *See, e.g.*, *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1222 (C.D. Cal. 2017) ("Plaintiffs plausibly allege that Vizio's Internet Apps and Internet Apps Plus are designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their homes."); *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012) (finding that "digital distribution" is covered even though "the online streaming mechanism of delivery here did not exist when Congress enacted the statute in 1988"). But it does not logically follow that movie theaters should fall under this expansion. It almost goes without saying that movie theaters were ubiquitous when the VPPA was enacted in 1988 and amended in 2013.[5] Yet there is no suggestion from the statutory language or legislative history that Congress intended to extend a right to privacy to the public act of attending a movie theater showing.[6]

---

issue here[] codifies a context-specific extension of the *substantive* right to privacy.") (emphasis in original); *see also* S. Rep. 100-599, at 4 ("If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch.") (quoting *Stanley v. Georgia*, 394 U.S. 557, 565 (1969)); *Id.* at 6 ("This bill will give specific meaning to the right of privacy, as it affects individuals in their daily lives.") (Sen. Grassley). Theater patrons, on the other hand, have no constitutionally protected privacy interest in what movies they may view in a public theater. *See generally Paris Adult Theatre I*, 413 U.S. at 50 ("Exhibition of obscene material in places of public accommodation is not protected by any constitutional doctrine of privacy. A commercial theater cannot be equated with a private home…."); *Martinez v. Nygaard*, 831 F.2d 822, 826 (9th Cir. 1987) (Where Plaintiffs had "no private space in any part of the building, … no possessory interest in the place searched or things seized, and no right to exclude others from the premises … , plaintiffs had no reasonable expectation of privacy in their workplace.").

[5] Congress passed the amendment, titled the "Video Privacy Protection Act Amendments Act of 2012," in January of 2013. Pub. L. No. 112-258, 126 Stat. 2414.

[6] Plaintiff argues that Congress indicated that movie theaters fell under the VPPA by specifying in the legislative history that "similar audio visual materials" included "open-reel movies." S. Rep. 100-599, at 12. Plaintiff implies "open-reel movies" necessarily refers to the technology used in movie theaters. The Court reads far less significance into this reference. Open-reel movies are listed alongside other video formats such as "laser discs" and "CDI technology." Like these other formats, open-reel movies

The VPPA caselaw, when read in totality, supports the conclusion that the VPPA intended to address *private video viewing habits*—not public acts like attending a theater. *See generally, Paris Adult Theatre I*, 413 U.S. at 65 ("[I]t is unavailing to compare a theater, open to the public for a fee, with the private home…."). The Third Circuit makes this distinction quite plain:

> "Congress's purpose in passing the Video Privacy Protection Act was quite narrow: to prevent disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's **video-watching habits**. We do not think that, when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage."

*In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) (emphasis added). "Video-watching habits" is simply not a natural way to describe films viewed in a public movie theater. Not surprisingly, Plaintiff has not identified a single case in which the VPPA has been applied to a theater.[7]

The Court notes that this order does not extend to the question of whether movie theaters can potentially be considered VTSPs if they engage in other prohibited conduct, such as disseminating online movies or trailers and then disclosing a viewer's home-viewing history. But even reading the Plaintiff's Complaint broadly, no allegations of this kind are made or implied. Plaintiff's allegations here focus on a specific disclosure: that Landmark shared with Facebook the name of the movie for

---

were commonly viewed in the home at the time the VPPA was enacted, as the Court recalls fondly from many years of viewing open-reel home movies in the 1970s.

[7] Plaintiff cites to the case *Goldstein v. Fandango Media, LLC*, in which a district court found the VPPA claim against Fandango inappropriate for resolution at the pleading stage. Fandango operates the streaming service Vudu and "monetizes video clips through advertising." 2023 WL 3025111, at *1 (S.D. Fla. Mar. 7, 2023). It also operates a website and app on which users watch movie trailers, browse Rotten Tomatoes scores, and buy movie tickets to theaters nationwide. *Id*. However, unlike Landmark, Fandango does not operate movie theaters. Plaintiff alleged that Fandango shared not just movie titles of the tickets purchased but also disclosed the videos watched across its website and app. Fandango argued it is in the business of selling movie tickets, and the videos serve only to promote that business. The Court, however, held that the question of whether Fandango is a VTSP requires a factual inquiry into *the nature of Fandango's business* to determine "how much business [Fandango] devotes to each of these goals." *Id*. at *3.

9

which Plaintiff Osheske purchased a ticket. *See* Compl. ¶ 48. Because the Court's decision here forecloses Plaintiff's claim with respect to that disclosure, the Court grants Defendant's Motion without leave to amend.[8]

## V.     CONCLUSION

For the reasons stated herein, Landmark's Motion to Dismiss is granted and Plaintiff's Complaint is dismissed without leave to amend.

**IT IS SO ORDERED.**

Dated: October 31, 2023

_____
Hernán D. Vera
United States District Judge

---

[8] Although generally a court granting a motion to dismiss should also grant leave to amend, "leave to amend need not be granted when 'any amendment would be an exercise in futility,' such as when the claims are barred by the applicable statute of limitations." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1103 (9th Cir. 2018) (quoting *Steckman v. Hart Brewing*, Inc., 143 F.3d 1293, 1298 (9th Cir. 1998)). Since Plaintiff's Opposition asserts no other theories of relief or other possible facts, the Court concludes any amendment on this claim would be futile.